HOGE WARREN ZIMMERMANN CO.,
Appellant,

v.

NOURSE & CO., and Carl C. Nourse,
Appellees.

NOURSE & CO., and Carl C. Nourse,
Cross-Appellants,

v.

HOGE WARREN ZIMMERMANN CO.,
Cross-Appellee.

Nos. 14213, 14214.

United States Court of Appeals
Sixth Circuit.

Aug. 22, 1961.

John Melville, Cincinnati, Ohio (Allen & Allen and Stanley H. Foster, Cincinnati, Ohio, on the brief), for Hoge Warren Zimmermann Co.

J. Warren Kinney, Jr., Cincinnati, Ohio (Edward J. Utz, Cincinnati, Ohio, on the brief), for Nourse.

Before MILLER, Chief Judge, WEICK, Circuit Judge and THORNTON, District Judge.

THORNTON, District Judge.

This was an action brought for the infringement of Patent No. 2,625,381 entitled "Process of Continuously Preparing a Gypsum Slurry" which was issued to Hoge and Zimmermann on January 13, 1953. The defendants pleaded invalidity and noninfringement as defenses.

The parties to this controversy are in the business of placing gypsum on roof decks. On February 19, 1960 the District Court filed findings of fact and conclusions of law and rendered its judgment that the plaintiff had failed to sustain the burden of proof of its complaint, and that the defendants were entitled to judgment with their costs; that the defendants sustained their burden of proof on their defense of invalidity of the patent in suit; but that the defendants failed to sustain their burden of proof on their counterclaim seeking attorney fees and damages. Both sides have appealed from the District Court's denial of their respective claims as outlined above. We will first consider the appeal of the plaintiff-appellant, No. 14213, wherein the appellant presents 20 questions for review by this Court, the first 13 of which relate to the validity of the patent in suit, the next 4 to the "scope" of the patent, and the last 3 to "infringement." Appellant claims to have made a notable contribution to the art, and contends that the defendants should not be permitted to reap benefits therefrom free of liability. The defendants contend that they have established that the patent in suit is invalid because

> (1) it relates to a wholly inoperative and unattainable condition;
>
> (2) it attempts to define something which is not disclosed in the earlier (1948) application of which the later (1950) application is allegedly a "continuation-in-part"; and
>
> (3) there was a public use three and one-half years before the filing of the present (1950) application.

■■ "We are bound in patent cases by fact findings of the trial court which are not clearly wrong." National Latex Products v. Sun Rubber Co., 6. Cir., 1959, 274 F.2d 224, 238. In applying this rule, in McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20, the Supreme Court stated as follows:

"A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed,' * * *"

In applying this test to the findings of fact of the District Court, we have made some observations which will be discussed below.

### Discussion.

At the outset, the appellees present a Counter-Statement of Facts, giving as their reason that "the Statement of Facts presented in appellant's brief is misleading, incomplete, argumentative, in certain instances unsupported by the record, and in other instances clearly erroneous." From our examination of the two volumes of the Joint Appendix, and of the brief and reply brief of the appellant we are impressed that appellees were not without good reason in having submitted their Counter-Statement of Facts.

Patent No. 2,538,891 was issued to the appellant on January 23, 1951 and contained apparatus claims only; this patent is not in suit. Patent No. 2,625,381 was issued on January 13, 1953 and contains process claims only; this is the only patent here in suit, and typical of the claims in suit is claim 2, which is as follows:

"A process for continuously preparing a gypsum slurry for use, which includes the steps of metering dry calcined gypsum, metering water, bringing said metered gypsum and water into intimate contact and continuously and violently agitating them to form a slurry having a creamy, uniform texture, and to entrain air therein, passing said slurry promptly into a closed system, and subjecting said slurry, continuously throughout said closed system, to a mixing action for a period of time which closely approaches but does not exceed the critical conversion point of the slurry, and discharging said slurry from said closed system for immediate use." Ptf.'s Exhibit 38, Joint Appendix, p. 711a.

The brief of the appellant, at page 12, is authority for the following concession:

"The chief issue in this appeal is whether or not the process claims of the patent in suit are fully supported by the disclosures of the parent application of which it is a continuation-in-part. If the claims in suit *are* supported by the disclosures of the parent application, they are then entitled to the date of the first or parent application and are not barred by any public use. If, however, the claims are not entitled to the disclosures of the first or parent application, then they would be entitled only to the date of the second application, in which case they would be defeated by a prior public use."

As support for appellant's contention that the claims in suit were supported by the disclosures of the parent application, and thus entitled to the date of the first or parent application and not barred by public use, appellant presented the testimony of Mr. Ralph Grim as an expert. In appellant's brief appellant describes Mr. Grim variously as follows:

"A gypsum expert"

"The man 'skilled in the art' "

"This is confirmed by the testimony of a true gypsum expert who was familiar with both patents"

"His [1] testimony, therefore, as to the presence or absence of a basis in the parent case for the limitations in question in the patent in suit cannot have the dignity or persuasiveness which must be accorded to the testimony of Dr. Grim who was shown to be the top expert in the United States in the field in question."

In his testimony Mr. Grim identified himself as an educator of many years standing and, at the time of the trial, as research professor of Geology at the University of Illinois, with a special field of knowledge in the investigation of the occurrence and the composition and the atomic structure of minerals; he also testified that he had been retained as an expert in the "field of gypsum" on two occasions, by the United States Gypsum Company and in the instant case. When asked by counsel for the appellant "Professor Grim, you have read the '891 patent and understand it and you have read the '381 patent and understand it" he replied "I have read them and I think I understand them." On cross-examination Mr. Grim admitted that he had appeared in patent cases but that he did not claim to be a patent expert and, in addition, that he had not studied the proceedings involved in this litigation before the Patent Office. (Gypsum is in the mineral field. We are concerned here with patent litigation.)

The District Court found as a fact that the plaintiff's patent expert was not only wholly unfamiliar with the proceedings before the Patent Office during the prosecution of the patent application which matured into patent No. 2,538,891 or patent No. 2,625,381, but that he frankly admitted that he did not claim to be a patent expert. In contrast to the foregoing, Mr. Kingsland testified that he had studied patent No. 2,538,891 and that he had also made a study of patent No. 2,625,381 and of the file wrappers of each. From this study he gave a lengthy and detailed account of what this examination and study meant to him as a person skilled in patent law and patent procedure. He concluded that a public use and sale of a process in November 1947 would be a statutory bar to the validity

1. The reference is to Mr. Kingsland who, at the time he appeared as a witness at the trial of this cause, identified himself as a lawyer who had been in the practice since 1909, and whose entire professional life had been devoted to the practice of patent and trademark law with emphasis on patent law, except for a period from September 1947 to December 1, 1949 when he was a U. S. Commissioner of Patents.

of each of the seven claims of the method patent here in suit (No. 2,625,381). He based this conclusion upon a summary of all of his investigation and testimony which was to the effect that all seven claims of the method patent here in suit contain limitations which are not disclosed in the earlier parent application. Mr. Kingsland testified that the 1948 patent application made no reference to any further processing after the initial mixing in the mixer; that the 1948 application made no reference to a critical conversion point nor that there is anything in the 1948 application that would give a definition for the term "critical time"; nor was there anything in the 1948 application with reference to mixing in the hose; nor was there any basis in the 1948 application for the expression "that after the prepared gypsum slurry has passed into a closed system that it is further treated for a period of time which closely approaches but does not exceed the critical conversion point of the slurry." There is additional testimony from witnesses from both sides of the litigation, and from exhibits, to the effect that the claims of the patent in suit are not supported by disclosures of the parent application (No. 2,538,891). The patent in suit, No. 2,625,381, issued in 1953 on a patent application filed October 18, 1950. In the first paragraph of this patent it is referred to as "a continuation-in-part of our copending application, Serial No. 9,435, filed February 19, 1948, now Patent No. 2,538,891, issued January 23, 1951." This 1948 application, as filed, contained both apparatus and process claims, and of these process claims No. 6 was considered by the inventors Hoge and Zimmermann as a basic process claim and reads as follows:

"6. A continuous process of laying gypsum concrete on a previously prepared roof deck form or the like, which includes the steps of continuously and rapidly preparing said gypsum concrete for use at a remote point, and continuously and rapidly conveying said prepared gypsum concrete to said roof deck." "Gypsum concrete" is synonymous with "gypsum slurry" according to the testimony of Mr. Hoge. (Transcript, Joint Appendix, pp. 158a and 136a, respectively.)

This basic process claim was rejected by the Patent Office as not patentable and appellant does not contest this fact. Claim No. 6 was then cancelled and three new method claims, Nos. 37, 38 and 39, were submitted. At this point these were the only process or method claims remaining in the 1948 application and on July 25, 1950 they were rejected by the Patent Office. With the cancellation of method claims Nos. 37, 38 and 39 by the appellant, the condition of the 1948 application was such that it could be allowed as patent No. 2,538,891 containing nineteen apparatus claims. From the history of rejections (for nonpatentability because of prior art) of process claims submitted by the appellant in conjunction with its 1948 application, it is obvious that the appellant would not have again re-submitted process claims that were similar to those already rejected by the Patent Office.

The District Court found that defendants' process of preparing and pumping gypsum slurry does not infringe upon the claims of patent No. 2,625,381.

There is an abundance of testimony and discussion about the charge of infringement, but the simple fact is appellant claims that in *its* process the gypsum slurry mixes in the hose of *its* patented apparatus. There is also competent testimony to the effect that the gypsum slurry does not and cannot mix as it is being propelled through the hose in the operation of the process here alleged to infringe.

Dr. Wong testified as an expert for the defendant as follows:

"Q. Can you move this slurry, such as the type of slurry that is pumped like Mr. Nourse's in the Nourse system, in the Nourse apparatus, at such a rate of speed, at such velocity, that you will create turbulence? A. No.

"Q. Why not? A. Because we would have to increase the speed in the neighborhood of 15 to 20 times?

"Q. If you increased the speed of 15 to 20 times, you would have turbulence, is that right? A. It is not possible with a Moyno to operate at 15,000 revolutions a minute.

\*     \*     \*     \*     \*

A. There is none because only in a turbulent flow do you get an interchange of particles sideways through the hose or conduct passage." (Transcript, Joint Appendix, pp. 540a, 443a.)

■ After examination and consideration of the appendices, of the briefs, and of the pertinent law, we are firmly convinced that "no mistake has been committed," and that there is substantial evidence to sustain the findings and conclusions of the District Court determining invalidity of the patent in suit. Inasmuch as the claims of said patent are not supported by disclosures of the parent application, and since the appellant has conceded prior public use of the process claims of such patent (January 13, 1953), there would be a statutory bar [35 U.S.C.A. § 102(b)] to the validity of the seven claims of this patent, which would also completely justify the findings and conclusions of the District Court as to invalidity. Substantial evidence also exists to sustain the findings and conclusions of the District Court that the process of preparing and pumping gypsum slurry used by the defendants does not infringe upon the claims of patent No. 2,625,381.

In view of our disposition of the preceding issues in this case, it becomes unnecessary to discuss the remaining issues raised on this appeal. The findings and conclusions of the District Court are affirmed.

Appeal in No. 14,214—Counterclaim.

In Fact Finding No. 37 the District Court found that "defendants have failed to sustain their burden of proof as to damages and award of attorney fees of their counterclaim." It is the position of the defendants-appellants that said findings and paragraph 4 of the judgment (dismissing the counterclaim) are clearly erroneous and contrary to the evidence of record. They rely upon 35 U.S.C.A. § 285 as the authority pursuant to which the District Court should have granted the relief requested by them in this respect. Section 285 provides that "the court in exceptional cases may award reasonable attorney fees to the prevailing party."

The prayer for relief in defendants-appellants' counterclaim seeks payment of "three times such damages as defendants shall have sustained as a consequence of plaintiff's having filed this action against defendants," reasonable counsel fees, and also the "sum of $250,-000.00" as punitive damages for the wilful, malicious, premeditated and fraudulent acts of plaintiff."

■■ First, in relation to section 285 the cases are in accord that its application is discretionary with the District Court. Former section 70 so provided, and it has been held that the substitution of the phrase "in exceptional cases" has not done away with the discretionary feature. "Both before and after the change in wording this Court has interpreted this section as making the trial court's determination of attorney's fees final where it has clearly stated the basis for the award, 'except where there is an abuse of discretion amounting to caprice or an erroneous conception of the law on the part of the trial judge.'" Talon v. Union Slide Fastener, 9 Cir. 1959, 266 F.2d 731, 739; Carolina Lee Knitting v. Johnson & Johnson, 4 Cir., 1960, 275 F.2d 91. Also see the discussion of this subject by Judge O'Sullivan of this Court in an opinion by him as a district judge, cited as Clinton Engines v. Briggs & Stratton, D.C.1959, 175 F. Supp. 390, 401–403. It is clear from the cases decided under section 285 that the determination of the district court will not be upset unless there has been an abuse of discretion. From the record here we conclude that the District Judge

784

did not abuse his discretion in denying relief pursuant to 35 U.S.C.A. § 285.

Related to the above, since exceptional circumstances have been interpreted as incorporating concepts of fraud, malice, bad faith and other similar concepts, is the contention of defendants-appellants that they are entitled to damages commensurate with those awarded in cases of malicious prosecution. The gist of the argument in this respect may be subdivided into two aspects. One addresses itself to the application for the patent, that plaintiff knew, or should have known, that it could not get a valid patent and that it was guilty of various departures from honesty, or of subterfuge in obtaining the patent. The second aspect of this argument is that, at the very least, plaintiff-appellee was guilty of bad faith in having failed to conduct various tests, prior to the institution of the lawsuit, to analyze the basis for its infringement claim. Defendants-appellants contend that plaintiff-appellee knew there was no infringement and brought the action out of malice as an economic lever against a competitor.

█ The absolute answer to the first aspect is, of course, the irrefutable FACT that plaintiff-appellee was granted a patent and brought the suit on the patent. As pointed out in its briefs, a patent carries with it a presumption of validity. What more needs to be said on this particular point we are at a loss to know. How it got the patent, or what it thought about its validity, these questions, in our opinion, have no proper place in a consideration of malice or bad faith on plaintiff-appellee's part in bringing this infringement action against defendants-appellants. We therefore eliminate this aspect from further consideration.

The second aspect of the "malicious prosecution" charge is bottomed mainly on the alleged failure of plaintiff-appellee to have conducted adequate investigation prior to suit which defendants-appellants contend would have disclosed to plaintiff-appellee the impossibility of the existence of infringement. It is the position of defendants-appellants that plaintiff-appellee should have attempted to duplicate defendants-appellants' operation in pumping gypsum slurry and thus become apprised of non-infringement. We do not conceive that there was any such duty owed by plaintiff-appellee to defendants-appellants as a prerequisite to bringing this action. The circumstances surrounding development of the method used by defendants-appellants, as well as the apparent modus operandi, were sufficient to constitute probable cause to believe that defendants-appellants were infringers. The existence of probable cause is, of course, the classic defense to malicious prosecution. We see no need to here review the factual details that we consider to have been sufficient to constitute probable cause. They are apparent to anyone upon review of the record. The fact that the accused process was found not to infringe is, of course, no criterion having determinative value in the assessment of probable cause.

The dismissal of the counterclaim by the District Court is therefore affirmed.