William Minor DEYERLE and Orthopedic Equipment Company, Inc., Plaintiffs-Appellees,

v.

WRIGHT MANUFACTURING COMPANY and Frank O. Wright, Defendants-Appellants.

No. 73-1754.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 12, 1973.

Decided April 23, 1974.

Samuel Scrivener, Jr., Washington, D. C., for defendants-appellants; Robert T. Rylee, II, Memphis, Tenn., J. Warren Kinney, Jr., Cincinnati, Ohio, on brief.

Eugene C. Knoblock, South Bend, Ind., for plaintiffs-appellees; James D. Hall, South Bend, Ind., Daniel D. Canale, Memphis, Tenn., on brief.

Before PHILLIPS, Chief Judge, McCREE, Circuit Judge, and CECIL, Senior Circuit Judge.

PHILLIPS, Chief Judge.

This litigation involves apparatus used in hip surgery for fixation of fractures.

Dr. William Minor Deyerle is the owner of United States Patent No. 3,002,514. The patented apparatus is described in the claims as "an instrument for use in fixation of fractures in the upper femur." Orthopedic Equipment Co., Inc. (OEC) is the exclusive licensee under the patent.

The complaint in the present case was filed by Dr. Deyerle and OEC for infringement of the patent, for common law trademark infringement and violation of the rights of Dr. Deyerle in his name and reputation and unfair competition in the use of the Deyerle name and patent number in connection with the sale and advertising of certain devices.

The defendants-appellants are Frank O. Wright and Wright Manufacturing Co. (WMC). The defendants challenged the validity of the Deyerle patent, denied infringement and alleged that they had permission to use the Deyerle name and patent number. They also counterclaimed for infringement of United States Patent No. 2,634,743.

The District Court upheld the validity of the Deyerle patent, found that Wright and WMC had willfully and intentionally infringed the Deyerle patent with respect to certain items and awarded treble damages for such infringement. The court also found common-law trademark infringement, unfair competition and violation of the rights of Dr. Deyerle in his name and reputation. The WMC patent was declared invalid.

Deyerle and OEC moved for reconsideration on the patent infringement issue. The District Judge amended his findings on this issue and held that certain of the Wright devices infringed the

Deyerle patent pursuant to the doctrine of equivalents. Wright and WMC also were held liable for inducing infringement. Costs and attorneys' fees were assessed against Wright and WMC, who appeal.

On appeal Wright and WMC contend: 1) The Deyerle patent is invalid; 2) they did not willfully infringe the claims; 3) their devices are not the equivalent of the patented device; 4) they had permission to use the Deyerle name and patent number; and 5) the award of attorneys' fees was improper. We affirm the judgment of the District Court except as to findings of direct infringement and infringement found pursuant to the doctrine of equivalents. We reverse those findings and modify the award of attorneys' fees.

## The Invention

The only patent in issue in this appeal is United States Patent No. 3,002,514, issued on October 3, 1961, to Dr. Deyerle on an application filed January 24, 1958, and entitled "Hip Setting Pin."

The invention as set forth in Claims 1 and 10,[1] the only claims in issue, relates

I.                    CLAIM 1

"An instrument for use in the fixation of fractures in the upper region of the femur comprising an elongated fixation nail adapted to project through the distal surface of the femur and the neck of the femur approximately along the axis of the neck and into the head thereof to a selected distance from the proximal surface of the femur head spacing the end of the nail therefrom sufficiently to accommodate absorption at the fracture site, said nail having a base to project outwardly from the distal surface of the femur, a vertically elongated nail plate having a head portion at the upper end thereof adjacent said base of said nail and a depending leg portion to be fixedly mounted on the distal surface of the femur shaft immediately below the trochanter, said nail being held by said nail plate against displacement from a pre-selected angular relation to the vertical axis of said nail plate to maintain a selected angle between the nail and the femur shaft, said head portion having a plurality of holes extending along axes parallel to and substantially symmetrically radially of the nail axis, and plurality of fixation pins slidably extending through said holes to project inwardly of said nail plate through the neck of the femur and terminate in the proximal cortex of the femur head, said fixation pins being slidably held by the bounding surfaces of said holes to resist angular displacement of the fixation pins in the distal cortex from axes paralleling said nail axis, whereby said nail, nail plate and fixation pins coact to provide a massive fixation of the fracture immobilizing the fracture against shearing and torsion forces while accommodating absorption at the fracture site and contact compression thereon."

CLAIM 10

"An instrument for use in the fixation of fractures in the neck of the femur and adjacent regions comprising a vertically elongated anchoring plate having a thickened head portion at the upper end thereof of substantially rectangular configuration and a depending leg portion to be fixedly mounted on the distal lateral cortex of the femur shaft immediately below the trochanter, said head and leg portions having a continuous concave cylindrical surface portion adapted to substantially conform to and abut the lateral cortex over a substantial vertical extent, said head portion having a substantially centrally located bore extending entirely therethrough along an axis inclined at a selected angle of the vertical axis of the anchoring plate corresponding substantially to the angular relation between the axes of the femur neck and shaft and eight guide holes arranged in a square pattern substantially centered on said head portion, said guide holes extending along axes parallel to and spaced in symmetrically arranged pairs relative to the center of said head portion, a plurality of fixation pins slidably supported in at least the majority of said guide holes to project inwardly of said anchoring plate through the neck of the femur and terminate in the proximal cortex of the femur head, the square pattern of guide holes including two transversely spaced rows of guide holes spaced apart a distance corresponding substantially to the radius of a femur neck, said head portion being of sufficient thickness so that the axial length of said guide holes is several times the diameter of one of said fixation pins, and said fixation pins being held by the bounding walls of said guide holes to resist angular displacement of said fixation pins in the distal lateral cortex and being slidably supported for axial displacement to accommodate absorption at the fracture site and contact compaction thereon whereby the anchoring plate and fixation pins coact to provide massive fixation of the fracture immobilizing the fracture against shearing and torsion forces while the anchoring plate accommodates relative axial displacement of the fixation pins in response to absorption and contact compression."

to a hip fixation device used by orthopedic surgeons to set fractures of the femur in the neck region between the head and shaft of the femur, and fractures in the intertrochanteric region of the femur.

The device comprises a metal plate having a rectangular thick head portion and a leg portion which is attached to the shaft of the femur. These portions have a continuous concave cylindrical surface which conforms to and abuts the lateral cortex of the femur for a substantial longitudinal extent.

The head portion has a substantially central bore which accommodates an elongated fixation nail. The bore extends through the plate at an angle of about 135 degrees to the plate. This angle corresponds to the angular relation between the axes of the femur neck and shaft. The head portion also contains a plurality of holes extending along axes parallel to and spaced substantially symmetrically radially of the bore axis. In one embodiment there are eight holes arranged in a substantially square pattern around the bore. These holes are adapted to receive fixation pins slidably extending therethrough and guided to extend through the neck of the femur and terminate in the proximal cortex of the femur head. The plate, nail and pins coact to provide a massive fixation of the fracture, thereby immobilizing it against shearing and torsion forces while maintaining contact of bone fragments and accommodating bone absorption or healing at the fracture site.

Although the only specific operative embodiments described in the patent relate to a Smith-Peterson nail as the central fixation device, the specification refers to the central nail as a "fixation nail" or a nail of the "Smith-Peterson type or the like." A Smith-Peterson nail is a triflanged nail and is considerably larger than a fixation pin.

### The Prior Art

Although there were hip fixation means available to surgeons prior to the invention of the Deyerle patent, they essentially lacked fixation adequate to permit the patient to move about or walk with crutches. These devices required immobilization for periods up to six months in length. The Deyerle devices have proved to be so successful that in many instances hip fracture patients are ambulatory within a week. When prior art means were in use, the fixation pins in the devices sometimes would become loose or back out. Oftentimes, this would result in non-union requiring removal of the device and substitution of an artificial hip member.

Many of the prior art devices used either a Smith-Peterson nail, a screw or modifications thereof to provide fixation. These devices relied principally upon the center nail for fixation. Other devices used fixation pins driven into the femur at converging angles or otherwise grouped in the center. Plates also had been used in conjunction with these devices.

While the prior art disclosed the elements of Deyerle's patented combination used individually or in two and three element combinations, there was no prior art device which fixed up to eight fixation pins in the proximal cortex of the head of the femur and maintained them there by a nail plate and a fixation nail. The device maintained the pins and nail parallel and in proper angular relationship in the cortex and avoided any loosening in the distal cortex. Absolute immobilization against shear and torsion forces was achieved, while still allowing for absorption at the fracture site and continued compact compression asserted by the weight and muscles of the body. The possibility of non-union and aseptic necrosis were decreased.

### Infringement

As in all cases of infringement, we begin with the claims (quoted in footnote 1), since they define the invention. Claim 1 is a combination claim wherein the device comprises essentially an elongated fixation nail, a nail plate adapted to hold said nail and a plurality of fixa-

tion pins with corresponding guide-holes. Claim 10, also a combination claim, relates to a device comprised essentially of a nail plate having a central bore and a plurality of fixation pins with their corresponding guideholes. Both claims set forth additional limitations which are not material for purposes of this appeal.

WMC makes and sells four types of nail plates. Types 738–B and 738–C (the two differ only in length) embody a central bore and eight peripheral holes. Types 738 and 738–A (the two differ only in length) differ from the B and C models only in the absence of a central bore. Instead, these devices have four holes located substantially within the area that would be occupied by the bore.

Since 1968, WMC has made and sold Smith-Peterson fixation nails. WMC has never made fixation pins for use in the Deyerle device, but has purchased them for resale from the Acme Engineering Company, Greensboro, North Carolina. Acme became a subsidiary of WMC in August 1970.

WMC does not assemble the patented combination. It makes and stocks the parts separately and sells them on randomly received orders.

The District Court held Wright and WMC liable for direct infringement for the making and selling of the four types of nail plates and for inducing infringement by the sale of Smith-Peterson nails and Deyerle fixation pins in an order or orders in conjunction with the sale of any of the four nail plates.

█ It is well settled that a combination patent protects only the operable assembly of the whole and not the manufacture of its parts. Deepsouth Packing Co., Inc. v. Laitram Corp., 406 U.S. 518, 528, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972). Since WMC does not assemble the patented combination, we reverse the finding of direct infringement for the manufacture and sale of nail plates per se. *Id.*

█ Coupled with the finding of infringement was an award of treble damages for the "willful and intentional" manufacture and sale of the nail plates with the central bore. Although not specifically directed to the inducement of infringement through the sale of the pins, nails and plates in combination, this finding necessarily is applicable to this practice. The sale of these nail plates was intimately connected with, and an integral part of, the inducement of infringement. It is implicit in the judgment of the District Court that damages be trebled for the sale of the nail plate with the bore, whether such sale was a direct or inducement infringement.

With respect to the sale of the nail plate with the bore, Wright and WMC made clear on oral argument that they appeal only to the extent that the District Court found the practice to be willful and intentional and awarded treble damages. We conclude that the award of treble damages is well founded.

The record shows that appellants surreptitiously counterfeited the plates with the central bore. These plates were sold in conjunction with fixation nails and pins and advertised with the Deyerle name and patent number. When appellants were contacted about the manufacture of Deyerle plates, they represented that they were buying Deyerle devices from OEC dealers when, in fact, they had counterfeited them. We cannot visualize a stronger case of willful and intentional infringement.

Appellants further contend that it was error for the District Court to equate a Smith-Peterson nail or the like with a fixation pin. Pursuant to the doctrine of equivalents, the court found that there was a medical or therapeutic interchangeability between nails and pins to accomplish the same essential purpose and equated a nail plate adapted to accommodate a large fixation nail through a central bore with a nail plate having four small central holes adapted to accommodate one to four fixation pins.

■ The doctrine of equivalents is rooted in the case law. It seeks to achieve a balance between preventing fraud on a patent and requiring the claims to set out the metes and bounds of the invention. The essence of the doctrine is that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). *Graver Tank* sets forth important considerations to the application of the doctrine:

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

"A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision, under general principles of appellate review, should not be disturbed unless clearly erroneous. Particularly is this so in a field where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience." 339 U.S. at 609–610, 70 S.Ct. at 856.

■ The Deyerle device was not a pioneer invention. It was, rather, an improvement in a crowded art as evidenced in the art of record. The claims, therefore, are only entitled to a narrow range of equivalents. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); United Shoe Machinery Corp. v. H. Gordon Co., Inc., 59 F.2d 903, 904 (6th Cir. 1932).

■■ As mandated by the Supreme Court in *Graver Tank*, equivalency must be determined against the context of the patent. The Deyerle patent draws a distinction between a fixation *nail* and fixation *pin* on the one hand, and between a *bore* and a *hole* on the other hand. The only specific operative embodiment of the device uses a Smith-Peterson nail. This nail was described by Dr. Deyerle as being triflanged with equal angles between the flanges and being slightly less than one-half inch in diameter in the flange portion and about one-half inch in diameter in its rounded butt portion. This is in contrast to a fixation pin which was defined in the patent as being from $1/8$ to $5/32$ inch in diameter. Thus, the nail is about four times the diameter of a pin.

Apparently the prior art has also recognized the distinction between a nail and a pin, for as Dr. Deyerle stated in his patent specification wherein he discussed the prior art:

"It has also been proposed to drive several fixation pins of very small diameter from the outside of the femur shaft through the neck and head of the femur and into the proximal cortex of the head. This, however, has

not been proposed in conjunction with a fixation nail . . . ."

Moreover, in addition to an art-recognized distinction between nails and pins, the art does not teach their equivalence.

The sole testimony bearing on the equivalence of the two devices was given by Dr. Deyerle and a patent attorney who testified as a patent expert. Although the District Court's finding rests solely on Dr. Deyerle's testimony, we find it particularly relevant to point out that the patent expert specifically disavowed any expertise with respect to the medical or therapeutic equivalency of the devices. He testified that the devices would be equivalent in so far as they were joining two rigid pieces, for example, two pieces of wood.

Dr. Deyerle's testimony was the only medical testimony on the subject and it was not even directly related to equivalency. Dr. Deyerle testified that he thought there was literal infringement of the claims. More specifically, he stated that a "bore is . . . a hole" and a nail is a pin. The most pertinent part of his testimony concerns the meaning of a "nail" wherein he stated:

"It meant a rod of varying stiffness, of varying shape, some triflanged, some with rolled-on threads, some with cut-in threads, the varying sizes, and a nail or pin, the words are practically interchangeable, to me, and to the orthopedic profession, and people I had contact with and people I was teaching with, and to my opinion as an orthopedist as a whole, this is their interpretation. It is almost interchangeable with the word 'pin' and it encompassed many things, even the Lorenzo screw, the others that have been mentioned, it had no specific limiting factors by usage."

The burden of proving equivalence rested on Dr. Deyerle and OEC. The evidence established only that nails and pins perform substantially the same function in substantially the same way insofar as they hold pieces of bone together by piercing each piece and establishing a metallic bond. There is, how-ever, absolutely no evidence showing that substantially the same result would be achieved by substituting a pin or pins for the nail. The patent expert specifically disclaimed any expertise on this point and Dr. Deyerle did not address himself to it. Nothing in the record shows that pins and nails act on the bone and tissue in the same way or that they produce the same results with respect to healing or that they would provide the massive fixation and resistance to shear and torsion that is required by the patented device.

The evidence actually points to the contrary. Dr. Deyerle testified that he preferred to use pins and rarely used the Smith-Peterson nail. He admitted that the nail, because of its increased rigidity, was preferable in situations where there is a badly broken up intertrochanter fracture.

We hold that the District Court's finding of equivalence was clearly erroneous. Appellants, therefore, are not liable for inducing infringement with respect to their activity in selling plates without the central bore.

### *Validity*

In view of our holding on the equivalency issue, we do not reach appellants' arguments concerning the invalidity of the device that does not embody the substantially central bore.

Appellants argue that the device comprised of the plate with the bore, nail and pins was obvious within the meaning of 35 U.S.C. § 103.

The ultimate question of patent validity is one of law and, accordingly, is not subject to the confines of the clearly erroneous test mandated by Fed. R.Civ.P. 52(a). Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L. Ed.2d 545 (1966); Kolene Corp. v. Motor City Metal Treating, Inc., 440 F.2d 77, 81 (6th Cir.), cert. denied, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971). In *Kolene* we stated:

"The question of 'obviousness' in determining patent validity is a mixed question of both fact and law. Kaiser

Industries v. McLouth Steel Corp., 400 F.2d 36, 41 (6th Cir.); National Filter, Inc. v. Research Products Corp., 384 F.2d 516 (5th Cir.); Hensley Equipment Co. v. Esco Corp., 375 F.2d 432 (9th Cir.). In ruling on that question the Supreme Court said:

(1) Under § 103, the scope and content of the prior art are to be determined;

(2) Differences between the prior art and the claims at issue are to be ascertained;

(3) And the level of ordinary skill in the pertinent art resolved.

(4) Against this background, the obviousness or nonobviousness of the subject matter is determined.

\* \* \*

· When the District Court determines items numbered 1, 2, and 3, it makes findings of fact which are binding on appeal unless the findings are clearly erroneous. Rule 52(a), Fed.R.Civ.P. It is the ultimate determination of the trial judge (item number 4 above) which is a conclusion of law with which this Court may disagree based on the established findings of fact. See Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., 332 F.2d 406 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93." 440 F.2d at 81.

█ Without reviewing in detail the District Court's findings of fact on the issue of obviousness, we point out that the District Judge found nothing in the prior art which immobilized a fracture against shearing and torsion forces while allowing for absorption at the fracture site in order to encourage early weight bearing and ambulation. We are in complete agreement with this finding and his conclusion that the invention was not obvious at the time it was made.

### Unfair Competition

On May 26, 1961, OEC entered into an exclusive licensing agreement with Dr. Deyerle for the manufacture and sale of the Deyerle device. Shortly after the agreement was entered into, WMC commenced buying the device from OEC for resale.

With OEC's knowledge and consent, WMC removed the OEC markings from the device and substituted its own name and trademark. OEC permitted WMC to use its catalog illustrations, the name "Deyerle" and the patent number of the device. Consequently, WMC illustrated these devices in its catalog and used identifying language that was identical to the language used on the same products in the OEC catalog. Additionally, WMC also used OEC's illustrations and wording for the unpatented fixation pins and applying apparatus used in conjunction with the Deyerle plate.

In November 1966, OEC terminated its relationship with WMC and refused to deal with it. For a short time, WMC purchased the device and apparatus from OEC jobbers or affiliated companies. · Subsequently these concerns also refused to sell to WMC.

In 1967 or 1968, WMC commenced making products that were almost identical to the OEC products. These products were advertised and sold as Deyerle products and they were identified with the Deyerle patent number. In 1969, WMC republished its catalog which continued to describe the products as Deyerle, but deleted reference to the patent number. The published price list used the term "Deyerle type."

The District Court found that Dr. Deyerle had never given specific permission to OEC or WMC to use his name, although he had entered into an exclusive licensing agreement with OEC. It further was found that OEC had built up a valuable good will in Deyerle products through extensive promotional efforts which included advertisements and demonstrations. Such goodwill, it concluded, brought about a name identification of these products.

The District Court found that, subsequent to November 1966, Wright and WMC did not have the express or implied consent of Dr. Deyerle or OEC to

use the Deyerle name or patent number. This unauthorized use was found to be calculated to confuse and mislead the public and, therefore, unfair competition under the Lanham Act, 15 U.S.C. § 1125(a),[2] even though the mark was not federally registered. Federal-Mogul-Bower Bearings, Inc. v. Azoff, 313 F.2d 405 (6th Cir. 1963). Similarly, the use of the Deyerle name and patent number was found to be unfair competition within the meaning of 35 U.S.C. § 292.[3] Finally, use of the Deyerle name was found to be common-law trademark infringement and also violative of the rights of Dr. Deyerle in his name and reputation.

The only response of appellants to this holding is an allegation that they had permission to use the Deyerle name and patent number. Apparently, this "permission" is to be implied from OEC's failure to retract specifically the understanding that the parties had prior to OEC's refusal to deal in November 1966.

■ Upon a review of the entire record, the briefs and arguments of the parties, we are convinced that the findings of the District Court on this issue are not clearly erroneous. The record supports the conclusion that WMC and Wright were acting without authority subsequent to OEC's refusal to deal in 1966. At that time, OEC terminated its relationship with the appellants.

*Attorneys' Fees*

We have affirmed the finding of the District Court that the sale of the Deyerle plate with the central bore was "willful and intentional," that appellants engaged in unfair competition within the meaning of 15 U.S.C. § 1125(a) and 35 U.S.C. § 292(a) and that appellants infringed the common-law trademark of Dr. Deyerle and violated his rights in his name and reputation. On the basis of these acts, which the District Judge characterized as being "willful, unfair, inequitable and unconscionable," attorneys' fees were awarded.

Appellants contend that it was an abuse of discretion for the District Court to award attorneys' fees. Specifically, they assert that the court did not make detailed findings in support of its award and the findings that were made were clearly erroneous. This latter contention is simply a rehash of appellants' arguments on the substantive counts.

■ Section 285 of Title 35 permits an award of attorneys' fees in patent cases when the circumstances are exceptional. In Hoge Warren Zimmerman Co. v. Nourse & Co., 293 F.2d 779, 784 (6th Cir. 1961), we noted that "exceptional circumstances have been interpreted as incorporating concepts of fraud, malice, bad faith and other similar concepts." In Uniflow Manufacturing Co. v. King-Seeley Thermos Co., 428

2. "Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

3. "(a) Whoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with anything made, used, or sold by him, the name or any imitation of the name of the patentee, the patent number, or the words 'patent,' 'patentee,' or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made or sold by or with the consent of the patentee;

\* \* \* \* \*

"Shall be fined not more than $500 for every such offense.

"(b) Any person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States. July 19, 1952, c. 950, § 1, 66 Stat. 814."

F.2d 335, 341 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970), we indicated that an award of attorneys' fees will be upheld if the trial court specifically finds conduct that is unfair, in bad faith, inequitable or unconscionable. An award made pursuant to findings such as these is discretionary. 428 F.2d at 341; 293 F.2d at 783.

The District Court made the findings that are required by *Uniflow*. Since we have agreed with the findings of patent infringement and unfair competition pursuant to 35 U.S.C. § 292(a), we hold that this was an exceptional patent case within the meaning of 35 U.S.C. § 285, and that the District Court did not abuse its discretion in awarding attorneys' fees. This award is supported by the finding of appellants' long and continuous course of inequitable and unconscionable conduct.

Although we affirm the District Court's determination that attorneys' fees were appropriate, we find it necessary to modify the award to the extent that it awards fees for the non-patent side of the case.

As a general rule, American jurisprudence does not sanction the award of attorneys' fees unless provided for by statute or contract. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). None of the generally recognized exceptions to this rule, such as in admiralty cases, civil contempt and actions where the plaintiff's suit establishes a common fund of recovery, are present here. The only authority in the instant case for an award of attorneys' fees is contained in 35 U.S.C. § 285. The award of attorneys' fees is modified to the extent that only those fees reasonably related to the patent infringement and unfair competition under 35 U.S.C. § 292 may be recovered under 35 U.S.C. § 285. Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 297–298 (9th Cir. 1969).

We are mindful that the unfair competition under § 292 and the willful and intentional patent infringement are intricately related and interwoven with recovery under the Lanham Act, 15 U.S.C. § 1125(a), and the common-law counts insofar as they show a long and continuous course of inequitable and unconscionable conduct and establish intent. On remand the District Court is directed to structure an equitable division of attorneys' fees for the patent and non-patent sides of the case.

Affirmed in part, reversed in part and remanded for further proceedings not inconsistent herewith. The costs on appeal are adjudged against appellants.

McCREE, Circuit Judge (concurring in part and dissenting in part).

I concur in the majority opinion except for its conclusion that the district court's finding of "equivalence" was clearly erroneous.

The district court held that Wright nail plates with small central holes for fixation pins were infringing because they were equivalent to the patented device's "central bore and large fixation nail." A finding of equivalence is a factual determination, Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), and in Zenith Corporation v. Hazeltine, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), also a patent case, the Supreme Court stated the proper standard for reviewing a challenged finding of fact to be:

In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a)

is not whether it would have made the findings the trial court did, but whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). See also United States v. National Assn. of Real Estate Boards, 339 U.S. 485, 495–496, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); Commissioner [of Internal Revenue] v. Duberstein, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). 395 U.S. at 123, 89 S. Ct. at 1576.

Here, the district court expressly found that "[t]he effect of Dr. Deyerle's testimony is to establish a medical or therapeutic interchangeability of various nails and pins to accomplish the same essential purpose through the differing devices here in controversy." Although the majority opinion concedes that the evidence established that nails and pins perform substantially the same function in substantially the same way, nevertheless, it concludes that there was "no evidence showing that substantially the same result would be achieved by substituting a pin or pins for the nail." Because of its determination that there is no evidence that the same result would be achieved by substituting pins, it holds that the finding of equivalence was clearly erroneous.

I disagree. Dr. Deyerle testified concerning the meaning of the term "fixation nail" in the patent claim:

It meant a rod of varying stiffness, of varying shape, some triflanged, some with rolled-on threads, some with cut-in threads, the varying sizes, and a nail or pin, the words are practically interchangeable, to me, and to the orthopedic profession, and people I had contact with and people I was teaching with, and to my opinion as an orthopedist as a whole, this is their interpretation. It is almost interchangeable with the word "pin" and it encompassed many things, even the Lorenzo screw, the others that have been mentioned, it had no specific limiting factors by usage. One doctor who used nothing, let's say, but Moore pins, where he said he was going to pin a hip, to him he meant he was going to use "Moore pins", that was the natural thing to do.

Another that used Smith-Petersen nail, he may use Smith-Petersen nail, the word "pin" or "nail" don't have too much limited factors in terms of the orthopedist's thought about it.

In my own thought, I think a little bit more of a nail as something that is pounded, would, like you [171] hammer a tack or a nail. This is just my feeling. This is the way I feel about it. I think a pin may be pounded, but more often is twisted in, drilled in, sometimes even pins are tapped in, even very small ones. So there are not many limiting factors, and it does cover a tremendous area.

The majority opinion considers this testimony but apparently finds it irrelevant because it was addressed to the issue of literal infringement. Although Dr. Deyerle did not testify directly that the challenged devices were "substantially the same" therapeutically as his patented device, the trial court could reasonably draw that inference from his testimony in the context in which it was given. In *Zenith Corporation,* for example, the Supreme Court concluded that the "evidence, although by no means conclusive, was sufficient to *sustain the inference* that Zenith had in fact been injured . . . . ." 395 U.S. at 114, 89 S.Ct. at 1571. Under the test for equivalence established in *Graver Tank,* the district court was required to find only that the devices produced substantially the same, not the identical, result. I conclude the evidence is sufficient to "sustain the inference" that the use of a central nail or central pins would produce substantially the same result. Because I am not left with a "definite and firm conviction that a mistake has been committed," *Zenith Corporation, supra* at 123, 89 S.Ct.

at 1576, quoting United States v. Gypsum Company, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L.Ed. 746 (1948), I would affirm the trial court in all respects.