**HART–CARTER COMPANY a corporation,**

**and**

**Cea Carter-Day Company, a corporation, Plaintiffs,**

v.

**J.P. BURROUGHS & SON, INC., a corporation, Defendant.**

**No. 76–40143.**

United States District Court, E.D. Michigan, S.D.

Jan. 9, 1985.

Richard G. Smith, Bay City, Mich., Charles W. Rummler, William A. Snow, Chicago, Ill., for Hart-Carter.

Gilbert A. Deibel, Saginaw, Mich., Roger W. Herrell, Philadelphia, Pa., for J.P. Burroughs.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

### FINDINGS OF FACT

### I. THE PARTIES AND NATURE OF THE ACTION

Plaintiff, Hart-Carter Company (hereinafter Hart-Carter), is a Delaware Corporation. Plaintiff, CEA Carter-Day Company (hereinafter Carter-Day) is a Minnesota Corporation having a principal office and place of business in Minneapolis, Minnesota and is a wholly-owned subsidiary of Hart-Carter which manufactures and sells grain dryers on behalf of Hart-Carter. Hart-Carter and Carter-Day are referred herein as Plaintiffs.

Defendant, J.P. Burroughs & Son, Inc., is a Michigan Corporation established in Saginaw, Michigan. It manufactures agri-

cultural equipment including grain dryers through its manufacturing division (previously known as A.T. Ferrell) known as Ferrell-Ross, Inc. (hereinafter Ferrell-Ross) with its principal facilities at Saginaw, Michigan.

This is an action for patent infringement. The patent-in-suit is U.S. Patent No. 3,629,954, issued December 28, 1971, to Hart-Carter as assignee of James P. Lavalier, and entitled "Gravity Flow Grain Dryer." This patent was issued on an application of James P. Lavalier filed in the U.S. Patent Office on September 26, 1968. Plaintiffs' date of conception of the invention was July 7, 1967.

Jurisdiction of this Court arises under the Patent Statutes of the United States and under Title 28, U.S.C. Section 1338.

Venue is laid in this District under 28 U.S.C. Sections 1391(c) and 1400(b).

## II. TECHNOLOGICAL BACKGROUND

After harvesting, grains cannot be stored for extended periods without suffering severe deterioration from the moisture content of the grain at the time of and immediately after harvest. Therefore it has long been necessary and common practice in the grain industry to dry grains to an acceptable moisture content before storage. To remove excessive moisture from the grain, grain dryers are used to reduce the moisture content of the grain to a level known from experience to be below the level at which deterioration occurs.

Gravity flow grain dryers as involved here are comprised essentially of an elevated garner for holding grain to be dried, and one or more vertical grain columns having perforate walls (walls with holes in them smaller than the grain). These grain columns receive grain continuously from the garner. This grain, by gravity flow, proceeds through grain treating sections or zones, wherein the grain is subjected to air flow at different temperature and humidity conditions for removing excessive moisture from the grain and then cooling the grain preparatory to storage. A mechanism is provided at the bottom of the vertical grain columns for removing the dried grain and for determining the rate of flow of grain through the grain columns and hence through the dryer.*

* Rough diagrams will be shown throughout to demonstrate the meaning. They are not intended to be scale nor to engineering or drafting standards—just illustrating what was described immediately preceding the diagram.

Common to all gravity flow grain dryers pertinent to this litigation (i.e., the dryer of the patent-in-suit, the accused dryers of the Defendant, and the various prior art dryers in evidence) is the vertical grain columns that extend from the grain inlet to the grain outlet. These columns may be arbitrarily divided into two or more grain treating zones or sections. A complete dryer simply utilizes various auxiliary equipment and structures, such as heaters, blowers, air ducts and the housing, for moving treated air (heated, reheated or unheated) into and out of contact with the grain flowing by gravity through the grain column.

To dry the descending grain in the grain column evenly, it was common in the prior art to direct hot, drying air through the grain alternately from one side and then the other. This technique, often referred to as "air reversal" was employed in U.S. Patent No. 1,151,268 of Hess, which issued in 1915.

As used in the vertically-arranged grain dryers with multiple grain columns and several treating zones where drying air passes in a generally horizontal direction through the grain columns, the term "air reversal" refers to a 180° change in air direction effected through the grain column in different treating zones of the dryer. Air reversal may be effected between drying zones or between cooling zones, or between a drying zone and a cooling zone.

*Air Reversal*

As used by Lavalier in the patent-in-suit and in his deposition, the terms "countercurrent" and "counterflow" are synonymous with the term "air reversal."

To retain and utilize heat contained in drying air that had passed through the grain column and which would otherwise be lost to atmosphere in the exhaust gases, it was common knowledge, as well as common practice in the grain dryer industry, to re-use or re-circulate those exhaust gases to improve the energy efficiency of grain dryers; that is, to reduce the amount of heat energy required to heat the circulated air to a temperature to dry the moist grain. The process of recirculating air to capture its heat is referred to as "air recirculation."

*Heater*

*Air Recirculation*

In employing air recirculation in grain dryers, highly and fully saturated or moisture laden air emanating from the top or upper zone or zones of the dryer should be exhausted directly to atmosphere, while exhaust air emanating from the lower heater and cooler zones was useful in air recirculation as such air was not as moisture laden

as the air that had passed through the upper zone or zones of the dryer and initially contacted the wettest grain. As used in the vertical grain dryer industry therefore, and specifically those with one or more vertical grain columns extending through multiple treating zones, the term "air recirculation" refers to a technique in which treating air that has passed through the grain column in a zone or zones of a heater, and has already performed its treating function, then is heated or re-heated for re-use in a heater zone of the grain dryer. This required the return of a portion of the exhaust air to the intake of the heater or heater fan. The purpose of recirculation is to capture the heat contained in the exhaust air and thus use less energy to heat that air to the desired temperature before forcing it again through the grain column.

Plaintiff's Shanzer dryer, is a simple two zone gravity flow dryer composed of a pair of vertical grain columns extending through a single upper heater zone and a single lower cooling zone. A first blower forced hot, drying air through the grain columns in the heater zone to dry the grain, and a second blower forced air at ambient temperature through the columns in the lower cooler zone to cool the grain. Both the hot drying air, and the cooling air (that becomes warm while cooling the grain in the cooling zone) were exhausted directly to atmosphere, and thus all heat energy in such exhaust air was lost. The Shanzer dryer thus did not employ the features of air recirculation or air reversal, although both features were well known to insure a more uniform drying of the grain.

A more advanced, prior art, gravity flow grain dryer is disclosed in U.S. Patent 1,151,268 of Hess, issued August 24, 1915. The Hess dryer was a commercially successful grain dryer. Plaintiffs later bought the grain dryer operations of the Hess Company. The Hess patent shows a three-treating zone, gravity flow grain dryer having four vertically extending grain columns. Cross sections of the dryer, taken through each of the three treating zones, are illustrated in Figs. 4, 5 and 6 of the patent. These drawings show the use of air reversal between the zones for promoting more uniform drying of the grain across the grain columns. (This air reversal is shown also in U.S. Patent No. 1,210,166 of Hess, issued December 26, 1916.) Separate heaters are provided at the inlets of the two upper zones to provide different drying temperatures in these heater zones. Outside air is drawn through the bottom or cooling zone, the temperature of that air being raised substantially as it cools the hot, dried grain passing through the cooling zone. The air after passing through the cooling zone is drawn into the intake of the blower and heated by the heaters in the two heater zones before it is blown through the grain in those heater zones. This reheating of air that has previously been used in the cooler zone of the dryer constitutes a form of air recirculation, which conserves heat.

Another commercial prior art, gravity flow grain dryer is the Ellis dryer, the subject of U.S. Patent No. 1,127,974, issued February 9, 1915.

Like Hess, Ellis divided his grain columns into zones, two drying zones and one cooling zone. To afford improved uniformity of drying and cooling of the grain, Ellis employed a unique form of air reversal. Also, in the interest of energy conservation, Ellis employed air recirculation, which has the heated air that had passed through the middle or lower heater section combined with the cooler air that had passed through the lowest or cooler section. This combined treating air from the outlets of Ellis' second and third treating sections or zones (counting from the top down) was pulled into the fan, heated by a heater, and then passed through the upper two heater sections of the grain dryers (that air passing through the uppermost heater section exhausting to atmosphere, and that air passing through the lower heater section recirculated as hereinbefore described).

Air Recirculation

Ellis Dryer

Air Reversal Feature

The recirculated air, particularly from the lower heater section, contains moisture picked up from the grain and that moisture serves to prevent "cracking" or "blistering" of the cool grain, which enters the grain dryer and is suddenly subjected to the overly severe drying effects of very hot dry air. This feature is particularly discussed in one of the very early Ellis patents, U.S. No. 1,001,259, issued August 22, 1911.

The Ellis recirculating grain dryer, the subject matter of U.S. Patent No. 1,127,974 and the Hess air reversal grain dryer of U.S. Patent No. 1,151,268 were both in substantial commercial use and were well known to those skilled in the art. The dryers disclosed in the Hess and Ellis patents were the subject of several publications.

## III. THE NATURE OF THE CLAIMED LAVALIER INVENTION

The invention of the patent-in-suit may be summarized as a grain dryer having three-vertically oriented and successive treating zones, wherein the grain to be dried is subjected to a heated dehydrating air in an upper or first heating zone and a second or middle heating zone, wherein the direction of flow of air is transverse to the body of the grain. The air flows through the first heater zone in an opposite or different direction then in the second heating zone, which provides "air reversal." The lower or third zone is a cooling zone in which the flow of incoming cool air is also transverse to the body of the grain. The air discharged from the second heating zone and the cooling zone is combined, heated and then passed through the first and second heating zones, which provide "air recirculation." The proportion of such recycled air is adjusted by controlling the column of air passing through the outlet of the second or lower heating zone, and this is accomplished by means of an adjustable damper. Fresh cooling air is introduced only into the third cooling zone, and humid air, containing moisture taken from the grain being dried, is exhausted to atmosphere only from the upper heating zone. The amount of air taken into the cooling zone is equal to the amount of air exhausted to atmosphere from the upper heater

zone, and the adjustable damper accurately controls the amount of recirculated air from the lower heater zone.

As admitted by the inventor, the gist or essence of the Lavalier invention of the patent-in-suit is the combination of air reversal and air recirculation in a grain dryer.

When the inventor, Lavalier, conceived the invention of the patent-in-suit, he was aware that the feature of "air reversal" between dryer zones was old in the art, and knew that the air reversal feature would work successfully because:

(a) he was aware that the air reversal feature had been used in prior dryers, and

(b) the feature had been tested in a Hart-Carter laboratory test model having parallel sections of grain columns through which air had been effectively reversed in the test drying of grain.

When the inventor conceived of his alleged invention, both he and the Plaintiffs were aware that the feature of "air recirculation" in grain dryers was old in the art, and that grain dryers which employ air recirculation were known to be more energy efficient than dryers without this feature.

The Hess patent No. 1,151,268, which taught the use of air reversal in grain dryers long prior to Lavalier's entry in the field, was found during a search of the prior art conducted by Hart-Carter's patent counsel, prior to the filing of the Lavalier patent application, and Plaintiffs have recognized that the Hess patent shows a grain dryer in which (as in the Lavalier patented dryer) there is an air reversal between the first (upper) and second (lower) heater zones of the three-zone dryer.

The Ellis patent, No. 1,127,974 taught the use of recirculation of air in grain dryers long prior to Lavalier's entry in the field. It was found during a search of the prior art conducted by Hart-Carter's patent counsel which search and discovery took place prior to the filing of the Lavalier patent application. Plaintiffs have recognized that the Ellis patent shows recircula-

tion of air from the lower part of the heating section and recirculation of air from the cooler section.

By the early 1960's, a person skilled in the grain-drying art would have known that:

(a) air reversal between sections of a vertical multi-section gravity flow grain dryer would provide more uniform drying of grain across the column.

(b) a grain dryer with air recirculation, i.e., recirculation of air from a portion of the heater section and/or cooler section, is more energy efficient than operation of the dryer without air recirculation.

(c) air recirculation adds moisture or humidity to the air that is recirculated to dry the grain.

(d) air recirculation adds moisture to the air supplied to a grain dryer's drying section and, thus, minimizes heat shock on the incoming cool grain.

(e) a grain dryer employing air recirculation exhausts less air to atmosphere than would a grain dryer, of the same capacity, having no air recirculation.

In addition to the knowledge concerning the highly developed state of the prior art possessed by Lavalier, the named inventor, by John O. Converse, Lavalier's supervisor and a Hart-Carter Vice-President, and by Charles Rummler, Hart-Carter's patent counsel, it also appeared to Joseph H. Mayhew, Chairman of the Board of Hart-Carter and himself a patent grantee, that there was little likelihood of any patentability of the Lavalier dryer development. Nevertheless, Mayhew directed Converse to proceed with the filing of a patent application.

## IV. FRAUD ON THE PATENT OFFICE BY PLAINTIFFS

Before filing the Lavalier patent application which led to the issuance of the patent in suit, Plaintiffs' patent counsel had two patentability searches made of the relevant prior art and reported the results to Plaintiffs. As a result of the first search, both

Plaintiffs and their patent counsel were familiar with much of the prior patent art relating to grain dryers, including Hallman Patent No. 2,764,819, the most relevant of the prior art patents cited and relied upon by the United States Patent Office. After the first search Plaintiffs and their patent counsel extended the search in an attempt to find more relevant art. In the second or extended search, the far more relevant Hess Patent No. 1,151,268 and Ellis Patent No. 1,127,974 were found. In Plaintiffs' patent counsel's second search report, Plaintiffs' attention was specifically called to the Ellis patent describing it as the most pertinent of the references found in the searches. Neither the Hess patent nor the Ellis patent were cited by the Patent Office during its consideration of the Lavalier patent application, nor were these significant patents brought to the attention of the Patent Office by Plaintiffs or their patent counsel.

In seeking data from Plaintiffs for use in drafting the Lavalier patent application, Plaintiff's patent counsel, in his letter of July, 16, 1968, stated that he would like to have a comparative table illustrating two dryers of substantially the same size, that is, a standard Shanzer-type dryer and a Lavalier-type (prototype) dryer of the same size of grain columns. The letter went on to say that "even though the prototype figures *are in some respects estimates* they will be valuable, however, to support our contention that the new prototype dryer produces a better drying operation with increased delivery capacity and at a considerably lower cost per bushel" (emphasis added). In his letter of September 19, 1968, Plaintiffs' patent counsel requested still additional data and stated that "if Jim [Lavalier] feels that he cannot give a fair estimate of the relative humidity range in each air stream, we can omit that column. *It would improve the picture,* however, if we did put in some figures *even though they are more estimate than actual test results*" (emphasis added).

Most of the numerical data presented in the patent-in-suit (see Example I, columns 4 and 5 of the patent-in-suit) relates to a comparison of dryers A and B, dryer B being a dryer of the type claimed in the patent-in-suit, and dryer A being a dryer described in the patent as a "typical prior art dryer." In fact, dryer A was a standard two-zone Shanzer dryer using a pair of blowers, one for each of the zone, but as mis-described in the patent-in-suit in Example I, dryer A had only a single blower and employed recirculation of the dryer's cooler air (which the Shanzer dryer did not do and could not have performed in the manner described in the patent).

The data presented in Table II of Example I in column 5 of the patent-in-suit is represented to be the results of meaningful, operating tests, performed under similar test conditions, of prior art "dryer A" and dryer B of the invention. While the patent does not expressly assert that the tests were of a technically valid, side-by-side type, the Patent and Trademark Office would have been so led to believe by virtue of the introductory statement, contained in the patent-in-suit, at column 5, lines 1–3, which states: "The Table II following shows the conditions of operation, the capacities and the end results of treating corn from the same bulk source in these two dryers." The quoted statement was not true, as Lavalier stated that the two dryers were not operated on the same day with air at the same atmospheric temperature, at the same location nor was the corn from the same bulk source. He further acknowledged that factors, such as differences in atmospheric temperature and in the quality of the corn, could create differences in test figures.

Table I of the patent-in-suit, at column 4, purports to present a representative volumetric relationship between the airstreams, shown in the airflow diagram of Fig. 3 of the patent-in-suit, during a typical drying operation. Plaintiffs have acknowledged that the column for Volume (CFM) was not actually measured by Plaintiffs during these tests, the air volumes instead having been derived from blower output tables published by the blower manufacturer. Also, Plaintiffs have acknowledged that the

volume of air in cubic feet per minute taken from output tables published by the blower manufacturer would not necessarily be identical to volume of air in cubic feet per minute that the blower would deliver when positioned in the regeneration zone of an air recirculating dryer of the type described in the patent-in-suit. Plaintiffs have further acknowledged that the output tables published by the blower manufacturer are not based on a test of the blower in a grain dryer of any type.

Lavalier, the named inventor in the patent-in-suit, referring to the air volume figures of 55,000 for "Volume of air at fans—CFM" and "Air discharged to atmosphere —CFM" in Table II, column 5 of the patent-in-suit, expressed doubt as to the accuracy of these figures, and admitted that it was not clear to him that the indicated CFM comparison (in Table II) between dryers A and B was correct. Plaintiffs have also acknowledged, referring to Example I, columns 4 and 5 of the patent-in-suit, that the figures presented in Table II, column 5, for "dryer B," are, "in some cases, estimates of values that were not exact measurements."

Example II, appearing at column 5, lines 55–64 of the patent is based on false data. Example II includes the statement that "[a]bout 500 BPH (wet basis) or 1000 BPH (adjust for 5% drying) can be treated ... to bring the moisture content to about 10% with a variation across the column of less than 1 percent for the finished corn." Plaintiffs acknowledged that no actual test was made in which the moisture content of corn was reduced to about 10% using a grain dryer of the patent-in-suit.

False data likewise appears in Example III, at column 5, lines 65–71 of the Lavalier patent-in-suit since Plaintiffs acknowledged that, in fact, Example III was not based on an actual test using a grain dryer as described in the patent-in-suit.

Figure 9, of the Lavalier patent-in-suit purports to show, in a pictorial or graphic manner, the data presented in Table II, column 5 of the patent under the general heading "Moisture Across Column—%."

Although the reader of the patent would be led to conclude that the data presented in the graph was derived from actual measurements made on an operating grain dryer, Plaintiffs acknowledged that the data set forth in Fig. 9 in the Lavalier patent, which was taken from Table II in Example I in the patent, were not based on tests performed on an operating Lavalier-type dryer, but rather was based upon a laboratory simulation of a drying operation.

With reference to the quality, accuracy and objectivity of the data contained in the Lavalier patent-in-suit, much of the data presented in the patent was selected not by objective and accepted scientific method.

Throughout the pendency in the United States Patent Office of the Lavalier patent application that subsequently issued as the patent here in suit, Plaintiffs' patent counsel knew that Rule 56 of the Rules of Practice established by the United States Patent Office, entitled "Improper Applications," provided that "any application signed or sworn to in blank or without actual inspection by the applicant, and *any application altered or partly filled in after being signed or sworn to, and also any application fraudulently filed or in connection with which any fraud is practiced or attempted on the Patent Office may be stricken from the files."* (Emphasis added.)

Under the provisions of Rule 56 of the Rules of Practice of the United States Patent Office, the Lavalier patent application Serial No. 762,750 could not be "altered or partly filled in after being signed or sworn to" without the application being regarded by the United States Patent Office as an "improper application" under Rule 56, and if known to the Patent Office, could subject the application to being stricken. Nevertheless, after the Lavalier application had been signed or sworn to by the inventor in Minnesota, Plaintiffs, through their patent counsel, made a total of more than twenty-three (23) alterations therein. Some of the twenty-three alterations involved multiple changes.

These alterations were made to pages 1, 2, 3, 11, 12 and 15 of the specification, and one sheet of drawing, and two pages of claims were added.

The alterations to the specification and claims were typed in the Chicago office of Plaintiffs' patent counsel. The alterations made in the patent drawing, included in the alterations referred to above, were also made in the Chicago office of the Plaintiffs' patent counsel.

The inventor, Lavalier, neither read nor physically saw the altered pages of his patent application, which matured into the patent-in-suit, before the application, as altered, was transmitted to the United States Patent and Trademark Office by his patent counsel. These alterations were not disclosed to the United States Patent and Trademark Office. These alterations were material and some embodied new matter which could not have been incorporated in the Lavalier application during the prosecution thereof in the Patent Office.

■ Certain of these alterations were made to correct errors in the patent application as it existed on the date of its execution by Lavalier, while others were made to add further new material and data to the patent application. There was no way the Patent Office could identify the alterations as they were not apparent from the face of the pages on which they appeared. Since Lavalier executed the inventor's Oath required under 35 U.S.C. Sections 111 and 115 on September 23, 1968, and because the patent application was materially modified thereafter, and the fact that these alterations were not disclosed by Plaintiffs and/or their attorney to the Patent Office, Plaintiffs and counsel violated their duty of candor to the Patent Office resulting in a fraud thereon.

■ Upon receipt of the Lavalier application, the Patent Examiner, in his first official action dated November 16, 1970, cited the Hallman Patent No. 2,764,819 as his principal reference and rejected all claims of the application as unpatentable over the prior art. To counter the effect of the Hallman patent, Plaintiffs' patent counsel responded by filing (with his Amendment A, dated February 16, 1971) an Affidavit executed by Lavalier's supervisor, John O. Converse wherein Converse purported to distinguish the Lavalier dryer from the dryer described in the Hallman patent by presenting a pair of psychrometric charts which were allegedly prepared to accurately demonstrate the superiority of the Lavalier dryer over the dryer of the Hallman patent. However, the psychrometric chart alleged to be representative of the operation of the Hallman dryer was a fabrication. Specifically, Fig. 2A of Exhibit 1 of the Affidavit is stated to have been derived from temperature and absolute humidity conditions described in the Hallman specification, but the Hallman specification is, in fact, silent with reference to the temperature and absolute humidity conditions essential to the drawing of the psychrometric chart 2A of the Affidavit. Furthermore, the Hallman specification is totally silent with reference to each and every one of the absolute humidity points displayed in the psychrometric chart of Fig. 2A representing the dryer of the Hallman patent. Moreover, whereas the Converse Affidavit assigned an evaporating capacity of 0.025 pounds vapor per pound of dry air to the Hallman dryer, there is no basis in the Hallman patent to suggest such an evaporating capacity, or, for that matter, any other evaporating capacity. In the light of the fabricated Hallman data, the Affidavit without any basis therefor, concludes that the "heating efficiency of the Lavalier-type dryer is substantially improved over Hallman." The inaccuracies contained in the Converse Affidavit constitute a fraud on the Patent Office.

Lavalier acknowledged that the Hallman dryer was impractical and that the Converse Affidavit was really comparing the Lavalier dryer to an impractical dryer. He likewise acknowledged that he felt at the time his application was filed, and still does, that the closest prior art was the Ellis patent which patent was known to Plaintiffs and to Plaintiffs' patent counsel.

Nevertheless that knowledge was withheld from the Patent Office.

■ Although both the named inventor, Lavalier, and his supervisor, John Converse, considered Lavalier's invention to consist of the combination of the principles of air reversal and air recirculation in a single grain dryer, Plaintiffs' patent counsel, when faced with a final rejection of the Lavalier patent application by the Patent Office, sought to convince the Patent Office of the Lavalier dryer's patentability by calling attention to a universally-employed feature in commercial grain dryers allegedly to distinguish the Lavalier grain dryer from the prior art cited by the Patent Office. To this end, on page 5 of Amendment B filed in the Patent Office on June 28, 1971, Plaintiffs' Patent Counsel represented to the Patent Office, as follows:

> "None of the references of record, or any other known prior art, in any way suggests the applicant's novel concept of passing the dehydrating gas at its highest temperature through the wettest granular material as it passes through the first zone and then discharging that portion of the gas directly to atmosphere." (Underlining supplied.)

On June 25, 1971, the day on which Plaintiff's patent counsel mailed his Amendment B to the Patent Office, he sent Hart-Carter's John O. Converse a copy of Amendment B remarking in the letter that: "By this Amendment, we have added the limitation with respect to the discharge of dehydrating gas from the first treating zone as we discussed last Wednesday and that Amendment, of itself, should result in allowance of our claims." Counsel's prediction was correct for the Patent Office in its next Official Action dated July 30, 1971, advised counsel that all of the claims were now considered allowable "in view of Applicant's communication filed June 28, 1971" (i.e., Amendment B). In fact the distinction made in Amendment B was false for essentially all prior commercial grain dryers are operated with the dehydrating air at its highest temperature passing through the wettest grain as it passes through the first

or upper zone of the dryer, the air then being discharged to atmosphere. Both Hess Patent No. 1,151,268 and Ellis Patent No. 1,127,974, have the feature which Amendment B states was unique. Plaintiffs and their patent counsel were aware that both patents had that feature at the time the Amendment was filed.

Because the "novel" concept represented in Amendment B resulted in allowance of the patent-in-suit and was a false representation, the filing of Amendment B constituted fraud on the Patent Office.

■ Under 35 U.S.C. § 102, subparagraph (b), issuance of a valid patent is barred if the invention claimed in that patent was on sale in this country more than one year prior to the date of the application for the patent. The Lavalier application, was filed on September 26, 1968, but a dryer in accordance with the patent-in-suit (the "so-called Dundas Dryer") embodying the alleged invention, was the subject of an option to purchase prior to September 26, 1967. It was, however, an experimental dryer, not known to work and involved the lease of land from the optionee to erect the dryer. All the facts and circumstances are such as to conclude that it was not in fact offered for sale more than one year prior to the application.

■ Although the activities of Hart-Carter's dryer salesman, Robert W. Hinz, in connection with the Dundas lease and option did not place the new Lavalier dryer "on sale," within the meaning of 35 U.S.C. § 102, subparagraph (b), more than one year prior to the date of filing of the filing of the Lavalier patent application, and thus does not invalidate the patent-in-suit, the question is a close one and neither the activities of Hinz nor the execution of the lease and option agreement and the circumstances surrounding them were ever brought to the attention of the Patent Examiner or the Patent Office so that it had an opportunity of evaluating the circumstances.

Plaintiffs' representation in the specification of the Lavalier application (especially

in the section, "Background of the Invention") and the Amendments filed during the prosecution of the Lavalier application concerning the state of the prior art known to the Plaintiffs, constitutes fraud, in view of the fact that the Plaintiffs were aware of both the Ellis and the Hess patents which contain a full disclosure of the subject matter which the Plaintiffs argued to the Patent Office was patentable to them.

█ Plaintiffs and their patent counsel made numerous individual misrepresentations and omissions which when considered together constitute a continuing course of deliberate, fraudulent conduct which renders the patent-in-suit clearly invalid or unenforceable. The totality of the omissions and misrepresentations together with the knowledge possessed by the Plaintiffs and their agents during the prosecution, the failure to disclose the alterations made to the application after the Oath was executed, demonstrate a continuing and consistent course of deliberate fraud on the Patent Office, particularly in view of the initial determination by Mayhew, the Chairman of the Board, which acknowledged that there was little likelihood of any patentability of the Lavalier patent but nevertheless required the preparation and filing of a patent application.

In addition to the foregoing, Plaintiffs placed on their grain dryers a name plate which, under the provisions of 35 U.S.C. § 287 "may give notice to the public that the same is patented." However, contrary to the spirit of 35 U.S.C. § 287, Plaintiffs' name plate designated not only the patent number of the relevant Lavalier patent, but also the patent numbers of a large number of patents that were not at all relevant to the grain dryer. One such patent was directed to smoking pipes and others, also irrelevant to the Hart-Carter dryer, were long expired. The inclusion of such irrelevant and expired patent numbers on Plaintiffs' name plate could only confuse and mislead and play a role in Plaintiffs' attempt to obtain a patent monopoly or to scare off competitors.

## V. AS TO DEFENDANT'S DRYERS AND ALLEGED INFRINGING DRYERS:

Prior to Lavalier's development of the dryer of the patent-in-suit, Defendant had developed and sold a 3-zone air-reversal dryer, designed substantially the same as Defendant's accused dryers except the Defendant's earlier dryer did not have air recirculation.

The idea of providing air recirculation to Defendant's non-recirculating dryer through the use of an external "add-on" duct through which the recirculated air would flow came from John B. Arnold, an employee of one of Ferrell-Ross' customers, Archer Daniel Midland, of Memphis, Tennessee. The Arnold "add-on" duct proposal was embodied in a number of drawings which were brought to the attention of the Defendant.

Arnold, well-versed in design, construction and operation of commercial dryers, did not consider that his suggestion of an "add-on" duct to the prior Ferrell-Ross dryer thus making it more energy-efficient through air recirculation, was patentable.

In adding the air recirculation feature by way of the external "add-on" duct to the prior, non-recirculating Ferrell-Ross dryer, no internal structural changes were made to the dryer, and its internal operation was not changed. Therefore, the dryer with the "add-on" duct could be operated with or without recirculation.

Adapting Arnold's "add-on" duct suggestion to its preexisting air-reversal dryer was justified by the fact that the concept of air recirculation was old and well-known to those skilled in the art as demonstrated by the early Ellis Patent 1,127,974.

The early Ellis patents taught one skilled in the art that, given a multi-zoned dryer, one could easily employ the well-known benefits of recirculation by combining outlet air from the cooling zone with outlet air from the lower of the two heating zones, recirculating the combined air back through the heater-blower combination and

using the regenerated air in the grain drying process in the two heating zones.

The principal feature that distinguished the Defendant's prior, 3-zone dryer from its other dryers was the use of air reversal between zones. The air reversal feature was in itself very old having been used decades before in the early Hess dryers from which the Defendant's air reversal feature was copied. Thus, Defendant's more recent recirculating dryers (e.g., the accused Olivia dryer which simply added air recirculation via an external add-on duct), were derived directly, and without the exercise of invention, from the early teachings of Hess (air reversal) and Ellis (air recirculation). The combination of the air reversal scheme of Hess and the air recirculation scheme of Ellis was obvious to one of ordinary skill in the art.

## VI. VALIDITY OF PATENT WITH REGARD TO OBVIOUSNESS

35 U.S.C. § 103 entitled "Conditions for Patentability; non-obvious subject matter," provides as follows:

"A patent may not be obtained, though the invention is not identically disclosed or described as set forth in Section 102 of this Title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

■ The Lavalier invention of the patent-in-suit is not identically described in any one prior reference. Nevertheless, an examination of the disclosures of Hess patent No. 1,151,268, taken in view of the disclosures of Ellis patent No. 1,127,974, are such that the subject matter of the Lavalier patent would have been obvious, at the time the invention was made, to a person having ordinary skill in the art to which the subject matter pertains. Like the patent-in-suit, the Hess patent disclosed a 3-zone, gravity flow, grain dryer employing air reversal. While the Hess patent did

disclose air recirculation from the lower cooling zone, it does not employ the air recirculation feature from the lower or second heater zone called for in claims 1 through 5 of the Lavalier patent. That precise feature, however, is found in the Ellis patent. The Ellis patent dryer, like the Lavalier patent dryer, is a 3-zone gravity flow grain dryer, employing air recirculation of the type employed by Lavalier. It would be obvious to one of ordinary skill in the art to modify the Hess dryer to employ air recirculation from the lower or second heater zone as disclosed in the Ellis patent. Thus, the Lavalier patent is "obvious" in the manner in which that term is used in Section 103.

When Lavalier conceived his alleged invention, the level of ordinary skill in the grain dryer art was such that an able or skilled engineer knowledgeable in grain drying and active in the field of grain dryers, having before such engineer the pertinent prior art as to air reversal and recirculation, such as the Hess and Ellis patents and publications and incorporated in already successful commercial dryers, would have found that it was "obvious" within the meaning of § 103 to combine air reversal and recirculation in column-type, gravity flow, multi-zone grain dryers.

Although in this action plaintiffs have claimed their invention to be essentially the combination of air reversal and recirculation, during the prosecution of their patent application, in Amendment B, they urged an additional feature of the Lavalier invention which distinguished it from the prior art—"the novel concept of passing the dehydrating gas at its highest temperature through the wettest granular material as it passes through the first zone and then discharging that portion of the gas directly to atmosphere." On trial, plaintiffs have admitted that this was not new or novel, that all prior dryers had this feature and the same was disclosed in both the Hess and Ellis patents.

The adjustable dampers or baffle plates referred to in claims 1 and 6 of the Lavalier patent (78 in Figures 3, 4 and 8) to control

the flow volume of treating gas or dehydrating agents were not new having been disclosed in Ellis patent No. 1,127,974.

■ The conclusion is inescapable that the meaning of "chamber" as used in the claims is different from the meaning of the same term in the specification. There is similar confusion in the use of the terms "zone" and "chamber" in independent claim 1 (and hence also in dependent claims 2 through 5). Hence the claim is indistinct and confusing and fails to meet the requirements of 35 U.S.C. § 112.

Because independent claim 6 omitted any requirement for air recirculation and failed to identify the means for reheating the dehydrating gas, it is invalid as failing to distinctly claim the combination of air reversal and recirculation which the applicant regarded as his invention.

What Lavalier sought to claim as his invention is fully disclosed in Ellis patent No. 1,127,974, issued February 9, 1915. Like Lavalier, Ellis used a vertical, gravity flow, perforate column grain dryer divided into 3 zones, 2 drying zones and one cooling zone at the bottom. Both had air recirculation where humid air having passed through the lower heater zone into a chamber (plenum) was combined in another chamber with air which had passed through the cooler zone. This combined air from the lower heater zone and the cooling zone was forced by a blower through a heater where it was reheated and then passed through the 2 heater zones. The reheated air passing through the upper heater zone was exhausted to atmosphere and that going through the lower heater zone combined again with the air having passed through the cooling zone and again recirculated. The addition of humidity to the recirculated air stream helped prevent grain damage in the nature of cracking or blistering which can occur when cold grain is suddenly subjected to the severe drying effects of very hot, dry air. The avoidance of such cracking and blistering was disclosed in both Ellis patent Nos. 1,127,974 and 1,001,259.

Since uniform drying is advantageous, Ellis used drying air currents successively from left to right and from above and below. While this technique of air reversal is not the same as either the Lavalier or Hess techniques, the methods are patentably equivalent, such equivalence being apparent and obvious to those skilled in the grain dryer art. Moreover, air reversal as in the Lavalier invention had been in commercial use for many years and disclosed in Hess patent No. 1,151,268.

## VII. THE LAVALIER PATENT CLAIMS ARE NOT READABLE ON DEFENDANT'S DRYERS

■ The Defendant's 3 Town and Country dryers which were charged as infringing were not so charged in their original condition, although they resembled the Plaintiff's dryer in almost all significant ways except that there was no air recirculation whatever, all air being discharged directly to atmosphere after passing through the grain columns. What Plaintiffs are complaining about in this suit is the sale of Defendant's "add-on" duct kits to be used with the Defendant's Town & Country dryer thus providing an air recirculating option to that dryer. The "add-on" kit, as earlier noted, requires no interior or structural changes to the dryer but does require openings in the housing to provide for air paths into the add-on ducts. Air reversal is not affected by the add-on ducts.

Defendant's Town & Country dryer (non-recirculating dryer) was derived from the Hess dryer as disclosed in Hess patent Nos. 1,151,268 and 1,210,166 both of which had expired.

The add-on duct concept was neither suggested nor taught by the Lavalier patent.

Technically, clause (a) of claim 1 does not apply to Defendant's dryer as each of the zones in Defendant's dryer comprises a number of individual chambers rather than an "individual chamber" as stated in said clause. It likewise does not apply because Defendant's dryer had 5 zones while Plaintiffs' have 3, and under no interpretation

could Defendant's dryer be construed as having 3 even if it were possible, as Plaintiffs claim to construe it as having 4 zones.

Clauses (b), (c), (d), (e) and (f) of claim 1 of the Lavalier patent-in-suit do not technically describe the Defendant's alleged infringing dryers. The word "technically" added to the previous sentence really is to express the Court's doubts as to the significance of these differences when compared to the significance of the fraud claimed by Defendant and the essential nature of the invention as claimed by the Plaintiffs.

Considering clauses (f) and (g) together, a significant difference from Defendant's alleged infringing dryers is noted. In Plaintiffs' dryer the air exhausted to atmosphere equals the amount of air taken into the cooling zone from the atmosphere. This process is controlled by dampers. The Defendant's dryers operate in such a manner that the amount of air taken from atmosphere is unrelated to the amount of air exhausted in the upper zone. Plaintiffs' dryer has one inlet for air while Defendant's has several inlets.

Because of the differences, claim 1 of the Lavalier patent-in-suit is not readable on any of Defendant's accused dryers since the aforementioned clauses of claim 1 do not technically find a response in Defendant's dryers. Therefore, claim 1 is not infringed. Because claim 1 is an independent claim and is not infringed by the Defendant's dryers, the claims dependent thereon, claims 2, 3, 4 and 5 are also not infringed.

The same conclusion is compelled with reference to clauses (f) and (g) of claim 6 and thus Defendant's dryers do not infringe claim 6 of the patent-in-suit.

The Defendant's accused dryers therefore do not infringe the Lavalier patent.

## VIII. DAMAGES SUFFERED BY DEFENDANT

Plaintiffs have violated the antitrust laws in attempting to enforce an illegally and fraudulently obtained patent monopoly. Plaintiffs' unfair acts of competition include attempted enforcement of the patent-in-suit obtained by fraud on the Patent Office, communicating with Defendant's customers and potential customers concerning the patent-in-suit and this infringement action resulting in Defendant's potential customers either refusing to deal with the Defendant or demanding from the defendant an agreement to indemnify the customers from any damages to Plaintiffs occasioned by the customers' use of Defendant's dryer. To some degree, although not quantified, Defendant's sales have declined. Quantification is not required for Defendant is not seeking damages therefor.

## CONCLUSIONS OF LAW

1. Jurisdiction, both as to parties and subject matter, and venue are proper here.

2. 35 U.S.C. § 282 provides for a presumption of validity to an issued patent. This presumption merely places the burden of proof of invalidity and has no independent evidentiary value. The pertinent prior art not considered by the Patent Office, and not presented thereto by the Plaintiffs during prosecution of the Lavalier application, effectively rebuts the presumption. *Dollar Elec. Co. v. Syndevco, Inc.*, 688 F.2d 429, 432 (CA6, 1982); *Universal Elec. Co. v. A.O. Smith*, 643 F.2d 1240 (CA6, 1981); *Eisele v. St. Amour*, 423 F.2d 135, 138–9 (CA6, 1970); *B.F. Goodrich Co. v. Rubber Latex Products, Inc.*, 400 F.2d 401 (CA6, 1968).

3. To be patentable, an invention must combine novelty, utility and non-obviousness. *Hanson v. Alpine Valley Ski Area, Inc.*, 611 F.2d 156, 159 (CA6, 1979); *Reynolds Metals Co. v. Acorn Bldg. Components, Inc.*, 548 F.2d 155, 159 (CA6, 1977); *Bolkcom v. Carborundum Co.*, 523 F.2d 492, 498 (CA6, 1975). *Westwood Chemical, Inc. v. Owens-Corning Fiberglas Corp.*, 445 F.2d 911, 914 (CA6, 1971) *cert den'd*, 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972).

4. At the time of the alleged invention of the Lavalier patent, the subject matter of the Lavalier patent claims would have

been obvious to a person of ordinary skill in the art at the time of the alleged invention. The level of skill in the art at the time of the alleged patent made it clear the difference between the patent claims and the prior art were design differences within routine skill of the art and supports the conclusion of obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Bolkcom, supra; Reynolds Metals, supra.*

5. Since the Lavalier patent-in-suit essentially combines air reversal with air recirculation, both shown in individual previous patents, it is a combination patent as to which the requirement of non-obviousness is stricter. Such a combination to be non-obvious must produce a different function, operation or result other than previously performed or done in order to be non-obvious. This combination fails in this regard. *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Anderson's-Black Rock v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *A & P Tea Co. v. The Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); *Smith v. Acme General Corp.*, 614 F.2d 1086 (CA6, 1980); *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 620 (CA6, 1978).

6. The Lavalier patent claims are ambiguous, indefinite and incomplete to the extent that they fail to distinctly claim the subject matter of the invention and thus violate the requirements of 35 U.S.C. § 112. *Antonious v. Progroup*, 699 F.2d 337 (CA6, 1983); *Cole v. Sears Roebuck & Co.*, 520 F.2d 673, 675 (CA6, 1975).

7. The violation of the Rules of Practice in Patent cases, 37 CFR § 1.56(c)(2), by submitting a patent application which contains changes made therein after the inventor signed the application adds force to the conclusion that the patent-in-suit was obtained by fraud on the Patent Office, although standing alone, such conduct would not be sufficient to deny the validity of the patent. *Halliburton Co. v. Dow Chemical Co.*, 182 USPQ 178 (N.D.Okla.1974) *modified* 514 F.2d 377 (CA10, 1975).

8. The doctrine of anticipation under 35 U.S.C. § 102(a) brought into play by the Ellis patent No. 1,127,974 also made the patent-in-suit invalid since the differences are minor to anyone of ordinary skill in the art inasmuch as the differences would suggest themselves to such a person.

9. The false and misleading information included in the specification having the effect of misleading the Patent Office; submission of the false and misleading Converse affidavit; the non-disclosure of the questionable lease—sale more than one year before the application; the deliberate non-disclosure of more pertinent prior art known to plaintiffs or their agents than the prior art disclosed to the Patent Office or cited by the patent examiner; and the misleading statement in the amendments filed during application prosecution all render the patent-in-suit invalid and unenforceable. *Calderon Automation, Inc. v. General Motors Corp.*, 206 USPQ 782 (E.D.Mich. 1980), *Dresser Industries, Inc. v. Eltra Corp.*, 432 F.Supp. 153 (N.D.Ohio, 1977); *Chas. Pfizer & Co. Inc. v. FTC*, 401 F.2d 574 (CA6, 1968); *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Skil Corp. v. Lucerne Products, Inc.*, 684 F.2d 346 (CA6, 1982); *Buzzelli v. Minnesota Mining & Mfg. Co.*, 521 F.2d 1162 (CA6, 1975); *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365 (CA6, 1977); *Walker Process Equipment, Inc. v. The Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

Because of the foregoing, the Court concludes that the patent was procured by fraud on the Patent Office.

10. The foregoing fraud and the institution of this infringement suit by Plaintiffs to enforce a patent which was known to be obtained by fraud, invalid or unenforceable, justifies an award of attorney fees to Defendant under 35 U.S.C. § 285. *True Temper Corp. v. CF & I Steel*

Corp., 601 F.2d 495 (CA10, 1979); *Campbell v. Spectrum Automation Co.*, 601 F.2d 246 (CA6, 1979); *Kearney & Trecker Corp. supra; Deyerle v. Wright Mfg. Co.*, 496 F.2d 45 (CA6, 1974); *Hoge Warren Zimmermann Co. v. Nourse & Co.*, 293 F.2d 779 (CA6, 1961).

■ 11. An invalid patent cannot be infringed and thus that issue is moot. *Bobertz v. General Motors Corp.*, 228 F.2d 94 (CA6, 1955), *cert. den'd*, 352 U.S. 824, 77 S.Ct. 32, 1 L.Ed.2d 47 (1956).

■ Defendants seek treble damages under 15 U.S.C. § 15 for Plaintiffs' alleged violation of 15 U.S.C. § 2 in attempting to enforce a monopoly of a patent knowingly obtained by fraud on the Patent Office. The attempt alleged by Defendants is the enforcement of such patent by bringing this infringement action and harassment of Defendant's customers. Defendant wants the attorney fees awarded under paragraph 10 above trebled. In this regard, it is found that the relevant market is the gravity flow, grain dryers which use air recirculation and reversal and, or course, plaintiffs cannot deny their intent to exclude competition thereon to the extent of the claims of the Lavalier patent. Moreover in the conduct upon which fraud on the Patent Office is found, is also found the basis for the finding here of Plaintiffs' predatory intent.

Defendants here, just as Defendant in *Kearney & Trecker*, did not prove direct market place damage from the Plaintiffs' anti-competitive acts. Yet the Sixth Circuit said as follows:

> However, the district court found that Milacron was placed in the position of being required to choose from among three alternatives—cease competing with K & T, take a license from K & T, or defend an infringement action. Milacron chose to defend the action brought by K & T, and in the course of these proceedings it established the existence of fraud to the satisfaction of the district court. This in itself met the requirement that there be a causal connection between the infringement suit and the antitrust activi-

ties and led the district court to conclude, as a matter of law, that Milacron was entitled to recover the costs and expenses of defending the infringement suit as damages for the antitrust violations.

Though this court has not decided the question, other courts have held that antitrust damages may include attorney fees and costs of defending an infringement suit where the real purpose of the action is to further an existing monopoly and eliminate the alleged infringer-defendant as a competitor. E.g., *Kobe v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir.), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952). In *Dairy Foods, Inc. v. Dairy Maid Products Coop.*, 297 F.2d 805 (7th Cir.1961), the court held that a pleading which charged that an alleged antitrust violator had put a competitor in the position of being required to choose among alternative responses, each of which had an adverse economic impact, sufficiently set forth an injury to business or property. The court further held that when such an injury is proven the costs and expenses of defending an infringement suit may be recovered threefold. *Id.* at 809.

\*　　\*　　\*　　\*　　\*　　\*

The most serious objection to the allowance of the costs and expenses of defending an infringement suit as antitrust damages was stated in *Straus v. Victor Talking Machine Co.*, 297 F. 791, 799 (2d Cir.1924), as follows:

> ... it would be a negation of the principle and right of free access to the courts to hold that the submission of rights to judicial determination involved a dangerous gamble which might subject the loser to heavy damage.

*See also Malta Manufacturing Co. v. Osten*, 215 F.Supp. 114, 123 (E.D.Mich. 1963). We agree that no barriers should be erected which prevent free access to the courts by one who believes in good faith that his valid patent is being in-

fringed. However, one who has established or is attempting to establish an illegal monopoly by fraud on the Patent Office or misuse of a patent should not be permitted to further this goal by means of an infringement suit. When the antitrust violations are causally connected to the infringement action it is permissible to include the expenses of defending that action in the award of damages. p. 374.

Accordingly, such trebling is authorized and will be ordered.

A passing reference should be made to remarks of the Tenth Circuit in *Ramey Const. Co. Inc. v. Apache Tribe, etc.*, 616 F.2d 464 (CA10, 1980) dealing with adoption of one party's proposed findings verbatim. pp. 467, 468. Although this was not done here, this reference is appropriate because the Court in its findings and conclusions has relied heavily on the proposed findings and conclusions submitted by Defendant and the extensive references in the record in support thereof. This was done because a critical review of the record convinces the Court of the substantial accuracy of Defendant's presentation. The Defendant's presentation has not been mechanically adopted but seriously considered and entered with significant modifications as the Court's own findings only after making "such changes as are necessary to be sure they reflect [my] opinion." *Nissho-Iwai Co. v. Star Bulk Shipping Co.*, 503 F.2d 596, 598 (CA9, 1974).

IT IS SO ORDERED.